CORBYN v. OKLAHOMA CITY et al.

No. 32066. March 5, 1946.

Rehearing Denied July 9, 1946.

Application for Leave to File Second Petition for Rehearing Denied Sept. 24, 1946.

*172 P. 2d 384.*

Rittenhouse, Webster, Hanson & Rittenhouse, of Oklahoma City, for plaintiff in error.

A. L. Jeffrey, Municipal Counselor, of Oklahoma City, for Oklahoma City.

Chas. H. Garnett and C. W. Wainwright, both of Oklahoma City, for defendants in error Peters et al.

HURST, V. C. J. On September 17, 1891, Peter Fichtenmueller, the then owner of lot 26 in block 49 of the original townsite of Oklahoma City, conveyed the south 40 feet thereof to Choctaw Coal & Railway Company. The deed contained a reverter clause identical with that involved and quoted in Oklahoma City v. Local Federal Savings & Loan Ass'n, 192 Okla. 188, 134 P. 2d 565, Jones v. Oklahoma City, 193 Okla. 637, 145 P. 2d 971, and Fuhr v. Oklahoma City, 194 Okla. 482, 153 P. 2d 115. Fitchenmueller died in 1899, and in January, 1900, lot 26 was sold and conveyed by an administrator's deed to J. H. Peters. The sale proceedings and deed did not reserve or except the 40 feet from the operation thereof. In February, 1900, Peters conveyed lot 26 to the Second Congregational Church, the deed containing this clause following the description and as a part of the granting clause: ". . . except that part of said lot lying south of a point forty feet North of the South end of said lot and heretofore conveyed to the C. O. & G. R. R. Company." In December, 1929, the interest conveyed to said church, by mesne conveyances, became vested in Marmaduke Corbyn. The south 40 feet of said lot was used by said railway company and its successors in title for railroad purposes from 1891 until December 4, 1930, when the same was conveyed by the owner, Chicago, Oklahoma & Gulf Railroad Company, and its lessee, Chicago, Rock Island & Pacific Railroad Company, to Oklahoma City. The city appropriated and has since occupied and used the same for public purposes.

Thereafter, Corbyn and the heirs of Fichtenmueller filed separate condemnation proceedings in reverse against Oklahoma City to assess and recover damages resulting from the appropriation of the south 40 feet of said lot. The two causes were consolidated, and thereafter the heirs of Peters intervened. The trial court found that the heirs of Peters were the owners of the property at the time it was appropriated and awarded to them the condemnation money. Corbyn alone appealed, making the city and the heirs of Fichtenmueller and the heirs of Peters defendants in error. No cross-appeal has been filed by either the city or the heirs of Fichtenmueller.

All parties agree that, under the decisions above cited and other decisions, the reversionary interest in the south 40 feet of said lot was alienable in January, 1900, when the lot was sold to Peters. The sole question is whether the deed from Peters to the church had the effect of excepting from the grant said 40 feet. Corbyn argues the case under three propositions, but they are so interwoven that we do not deem it necessary to discuss the propositions separately.

Corbyn argues that the interest retained by Fichtenmueller in his deed to the railway company was in effect an easement, but he does not point out wherein he could prevail if we should hold it to be an easement. It is sufficient to say that, in Oklahoma City v. Local Federal Savings & Loan Ass'n,

above, we held that a deed with an identical reverter clause conveyed a determinable fee on condition subsequent, and not a mere easement, and we followed that rule in Jones v. Oklahoma City, above. We adhere to that view. He cites several cases in support of his propositions. We have examined said cases, but do not find them in point. Some of them deal with rules for construing ambiguous deeds, others with exceptions or reservations that are ambiguous, others with deeds that contain no exception or reservation clauses, others with the rule of stare decisis. The exception in the deed involved in the instant case is substantially the same as that in the deed involved in Oklahoma City v. Local Federal Savings & Loan Ass'n, above. We there held that the exception is clear, and we hold that the exception here involved is equally as clear. There is no clause in the deed that in the least degree conflicts with the exception clause, hence rules of construction do not come into play. His argument that the exception clause was inserted to protect the warranty is without merit for the reason that it is a part of the granting clause and limits the grant. His argument that the exception clause may have been sufficient to retain to the grantor the land itself but not the right of re-entry is without merit, since the right of re-entry is incidental to, and goes with, the land.

Judgment affirmed.

OSBORN, BAYLESS, WELCH, CORN, and DAVISON, JJ., concur. GIBSON, C.J., and RILEY, J., dissent.

———

RILEY, J. (dissenting). Marmaduke Corbyn appeals from a judgment determining that J. H. Peters was the owner of the south 40 feet, lot 26, block 49, Original Plat of Oklahoma City, on December 4, 1930, when the land was abandoned for railroad use. The judgment determined that John Peters et al. were the sole heirs of J. H. Peters, deceased; that they were en-titled to recover the value of the property as compensation for its appropriation to another public use, towit, park purposes, by the defendant Oklahoma City.

The townsite trustees of Oklahoma City conveyed by deed, title to the lot, fee simple absolute, to Peter Fichtenmueller. In 1891 Fichtenmueller conveyed the south 40 feet of the lot to Choctaw Coal & Railway Company for railroad "right-of-way", specifically providing that in case of abandonment of the particular use for which the property was granted "the same shall revert to the grantor, his heirs or assigns".

The use for which the property was granted was abandoned on December 4, 1930. Consequently, that part of the lot so granted, its use for railroad right of way, merged with the servient tenement under it, to become fee simple absolute in whomsoever had right to the estate. Title did not return to the United States under Act of Congress February 18, 1888, and the amending Act February 13, 1889, which merely authorized the railroad company to locate and construct a railroad through the Territory, nor to the defendant city, successors in title by patent from the United States to the original townsite, confirmed by Act of Congress, 42 Stat. at L. 414, ch. 94, U.S.C.A. Title 43 § 912; Noble v. Oklahoma City, 172 Okla. 182, 44 P. 2d 135; Noble v. City of Oklahoma City, 80 L. Ed. 816, 56 S. Ct. 562.

The interest in real property conveyed under Fichtenmueller's deed was neither an easement nor yet fee simple absolute. The subject of the grant was corporeal, not incorporeal. Being corporeal, remedies available for the preservation of it were those of the fee. It was in perpetuity so long as so used. Possession was exclusive. New Mexico v. U. S. Trust Co., 172 U. S. 171, 19 S. Ct. 128, 43 L. Ed. 407. But the subject of the grant was limited, not by a determinable fee on condition subsequent, as thought to be the case in Oklahoma City v. Local Federal Sav. &

Loan Ass'n, 192 Okla. 188, 134 P. 2d 565, whereby a re-entry would be necessary on abandonment of the railroad right of way in order to make of the possibility of reverter an estate in land subject to a grant to third persons. That right of forfeiture was then thought to be nontransferrable except to the owner of the property affected thereby. Tiffany, Real Property, § 281. Contra, Fuhr v. Oklahoma City, infra. That right of forfeiture, not being an estate in land, would pass to the personal representative and not the administrator of Peter Fichtenmueller in 1899. Jones v. Oklahoma City, 193 Okla. 637, 145 P. 2d 971. Therefore, if the interest in land abandoned is a determinable fee on condition subsequent, it did not pass from the heirs of Fichtenmueller by that rule of law. The grant was not one of reversion, Kassner v. Alexander Drug Co., 194 Okla. 36, 147 P. 2d 979; Fuhr v. Oklahoma City, 194 Okla. 482, 153 P. 2d 115; Title 60 O. S. 1941 § 29, because a reversion is never a grant. Tiffany, Real Property, § 129. It is the residue of an estate left in grantor after grant of a particular estate less than the whole. It arises by operation of law. It is, of course, subject to further grant, but while the servient tenement impressed with railroad right of way is a reversion, the right of way is not, and it, as such, was not subject to further grant by Fichtenmueller. The merger occurred because the grant was not right of way which, when abandoned, no longer constituted a right of way; ipso facto to merge with the servient tenement to become fee simple absolute.

"A railroad is a public highway established primarily for the convenience of the people and to subserve public ends . . ." Western Union Tele. Co. v. Penn. R. R. Co., 195 U. S. 540, 25 S. Ct. 133, 49 L. Ed. 312.

Technical, legal terminology does not control in grants to railroads of right of way, but the context of the whole of such instrument governs. Abercrombie v. Simmons, 71 Kan. 538, 81 P. 208;

East Ala. Ry. Co. v. Doe, 114 U. S. 340. The right of grant to "assigns" of the railway corporation cannot be construed as extending to any assigns except one who should be the assignee of the railroad company's franchise to establish and run a railroad. Therefore, the assignment from the railroad company to the city availeth not.

There was no enlargement of the estate granted by conflict between the granting clause and the habendum; the granting clause controls generally. Moreover, "a deed granting particular land to a railroad company for a particular purpose is limited to that purpose." 1 L. R. A. (N. S.) 806; 3 Washburn on Real Property (6th Ed.) § 2357.

The office and purpose of the habendum clause, that is to say, that part of the deed which begins with the words "To have and to hold", is to limit and define the estate granted, but it is not an essential part of the deed, for, according to Chancellor Kent, it has degenerated into a mere useless form. If the granting part of the deed contain proper words of limitation, the habendum clause may be disposed with altogether. So, if the habendum clause is clearly repugnant to the grant, it has no validity or effect. Idem. Where the grant is of right of way it is not a grant of the fee, but, upon abandonment, the grant reverts to the grantor. In fact, the grant of right of way or a grant for railway purposes is sui generis. Atlantic & P. R. Co. v. Lesueur (2 Ariz. 428) 19 P. 157. The words used are not merely descriptive of tenure. Atlantic B. & A. Ry. Co. v. Coffee Co., 152 Ga. 432, 110 S. E. 214. The phrase "right of way" does not mean the right of passage merely. It has a twofold significance, sometimes used to mean the mere intangible privilege of crossing, and sometimes used to indicate land appropriated or granted to a railway company for its use and upon which it builds its roadbed and track. It is not an easement merely, but one peculiar

to a railroad. Western Union Tele. Co. v. Penn. R. R. Co., supra.

In Midland Valley R. Co. v. Corn, 21 Fed. 2d 96, it was held:

"Title to railroad company to lands acquired for right of way is not a fee, though having substantially the attributes of a fee for railroad purposes so long as the land is used for railroad purposes, but when such use terminates, it reverts to the grantor".

In Santa Fe, L. & E. R. Co. v. Laune, 67 Okla. 75, 168 P. 1022, this court held:

"The deed conveying the right of way shows plainly that it was the purpose thereof to convey a right of way through the land in controversy, and the land conveyed was limited to the use for which it was conveyed, to wit, for right of way purposes."

Whether purchased or condemned, the right of way is no more than a perpetual, exclusive right of passage; an interest in land for a specific purpose so long as devoted to that purpose. Marsbach v. Thurston County, 152 Wash. 562, 278 P. 686. While such a grant has been designated as a qualified or determinable fee, it is a substantial thing, capable of reverting without exercise of grantor's right of re-entry upon declaration of a forfeiture. It is more than an easement. Whatever its name, the interest taken is limited to that use and right of way reverts when the use is abandoned, irrespective of a provision to that effect in the grant, denominated a "reverter clause". So the servient tenement, sometimes called the fee, remains in the grantor, and that is so irrespective of whether the railway company's charter or the laws affecting it empowered the railway company to acquire a greater estate than that evidenced by the words "right of way". A voluntary deed conveying lands limited to right of way grants the railroad no more in quality of an estate in land than that acquired by condemnation. Where the intention to convey a fee does not appear, as in case of the conveyance for right of way,

the company takes the lesser interest.

The fact that the right conveyed is designated as a fee or that the deed contains covenants of warranty does not necessarily pass the fee. 1 Thompson on Real Property, 420. In Martin v. T. & P. Ry. Co. (Tex. Civ. App.) 53 S. W. 2d 514, a deed executed in 1872 conveyed land for depot purposes and uses of the railroad company. The land, in 1923, was abandoned for the purposes stated in the grant. It was held that the contention of appellee, T. & P. Ry. Co., that the deed vested a fee in it with a conveyance of user, was untenable. In Quinn v. Pere Marquette Ry. Co., 256 Mich. 143, 239 N. W. 376, it was held the character of the title taken depended upon the language of the conveyance; that where the grant is not of the land itself, but merely the use of it, or "of right of way," or of the land specifically for a right of way, the grant did not convey the fee.

In Center Bridge Co. v. Wheeler & Homes Co., 86 Conn. 585, 86 Atl. 11, the Connecticut court held:

"The easement which a railroad acquires in its right of way is like that of a highway in that it is for use of the public. It is one which has attached to it the incidents of exclusive occupation and enjoyment for the public use in a peculiar degree. It possesses features of perspective permanence."

In Gilbert v. M. & T. Ry. Co., 185 Fed. 102, there is nothing to detract from the rule herein stated. It concerns a deed without limitation or reservation in which a railroad right of way is not mentioned. But contra is Midland Valley R. R. Co. v. Sutter, 28 Fed. 2d 163, wherein it was held (8 C. C. A. Phillips, J.) that the minerals under a railroad right of way belonged to the owner of the fee and not to the railroad company. In Sherman v. Sherman, 23 S. D. 486, 122 N. W. 439, a guardian deeded a strip of land in 1887 to Cherokee & Dakota R. R. Company for its station grounds, track, etc. The issue was said to be the effect of the instrument under the laws of the Territory of Dakota in

force at the time and evidenced by section 2980, Stat. S. Dak., similar to subsection 3, Wilson's Rev. Anno. Stat. Okla., sec. 1022, authorizing a railroad corporation to construct, operate, or maintain a railroad and granting the power to acquire or purchase, hold and use real estate necessary for the construction of the railroad, and to lease or otherwise dispose of any part or parcel thereof, or sell the same when not required for railway use and no longer necessary to its use.

The interest acquired by that deed, as measured by the provisions of statute, was a fee. Provisions of the Constitution of Dakota, adopted long after the effective date of the grant (1887), were urged in dissenting opinion to sustain the view that the grant was not a fee. Provisions of the Dakota Constitution are very similar to those of Oklahoma, and they are construed differently, contrary to our decision in Marland v. Gillespie, 168 Okla. 376, 33 P. 2d 207. In both Dakota and Oklahoma the Constitution was adopted at a time much later than the effective date of the deeds considered. Surely, in both states, such constitutional provisions, subsequently adopted, were not controlling but merely harmonious with the statute in force at the time of execution of the conveyances. Those constitutional provisions, like ours, restricted the capacity of the railroad to take and hold real estate except as may be necessary and proper for its legitimate business. They provide that the fee of land taken for railroad track shall remain in the owner, subject to the use for which it was taken.

Despite the result reached in the Dakota decision, the rule applied did not extend after adoption of their Constitution. Anno. Note, Corporation Law, S. Dak. 1929.

In Marland v. Gillespie, 168 Okla. 376, 33 P. 2d 207, our court erroneously avoided the decisions of Kansas as being based on statutes "not found in Oklahoma statutes" limiting the powers of common carriers. The Kansas statute empowered the railroad ". . . to take and hold such voluntary grants of real estate and other property as shall be made to it to aid in the construction, maintenance and accommodation of its railway; but the real estate received by a voluntary grant shall be held and used *for the purpose of such grant only;* and to purchase and hold, with power to convey real estate for the purpose of aiding in the construction, maintenance and accommodation of its railway". It may be observed that section 1035, Stat. 1890, then as now in force in Oklahoma, provides:

"Powers of railroad corporations . . .

"Second. To take and hold such voluntary grants of real estate and other property, either within or without this State, as may be made to it to aid in the construction, maintenance and accommodation of its railroad; but the real estate received by voluntary grant shall be held and used for the purpose of such grant only.

"Third. To acquire under the provisions of this article, or by purchase, all such real estate and other property, either within or without this State, as may be necessary for the construction, maintenance and operation of its railroad, and the station, depot grounds, and other accommodations reasonably necessary to accomplish the object of its incorporation; to hold and use the same, to lease or otherwise dispose of any port or parcel thereof, or sell the same when not required for railroad uses and no longer necessary to its use."

There is nothing of substance contained in the Kansas statute, either as a grant or limitation of power, not found in the statutes of Oklahoma in force at the time of execution of the conveyance here involved. There is no substantial difference in the statutes. Doubtless the statutes in Oklahoma were adopted in view of the construction theretofore placed upon them, and while the Abercrombie Case in Kansas was not written until 1906, nevertheless the principle therein had been theretofore very generally accepted in American jurisprudence in the era following scandals

of national scope in the wake of Federal land grants to railroads.

Thereafter an instrument in the form of a general warranty deed voluntarily conveying land to a railroad company for right of way or for railroad purposes did not vest an absolute title in the railroad company but an interest in land, limited to the use for which the land was acquired, and when that use was abandoned, the land reverted to the adjoining owners, with or without clause so providing and contained in the deed. Abercrombie v. Simmons, supra, 1 L. R. A. (N. S.) 806, 114 Am. St. Rep. 509, 6 Anno, Cas. 239.

Independent or in view of statutes, voluntary grants to railroads governed by intention of the parties as expressed in deeds from which were omitted such phrases as "for right of way" or "for railroad purposes," measured sometimes by the breadth and scope of the railroad company's charter, it has been held elsewhere, as in Dakota, that a railroad company may acquire by voluntary conveyance fee title to land to be used for railroad purposes other than a right of way. Danielson v. Woestemeyer (1930) 131 Kan. 796, 293 P. 507; Elliott on Railroads (3d Ed.) § 461.

But as to land for right of way, there is no valid distinction in the character of the title acquired by the railroad under voluntary grants by purchase, and compulsory grants under the exercise of the powers of eminent domain. By neither does the railroad company hold a higher or better right or interest in the land granted for that purpose. Such a grant is less than a fee so that as to it, the railroad company may not abandon the enterprise and sell such lands to those who will put it to a wholly different use—one which may be both obnoxious and menacing to the adjoining landowners. Witness the inequity or injustice to adjacent landowners who grant private property for right of way for railroad thoroughfare which, when abandoned and assigned to individuals, enables them to exploit and develop natural resources, allows them right of operation and choice of location throughout the length of the passage way, originally designed for public use, to produce oil and gas and petroleum products not only from the servient estate under the passageway but also by drainage and despoliation the natural resources from under the adjoining land, to the detriment of the farmer or legitimate producer of petroleum products, operating under a lease from adjacent landowners. That this may not be done insofar as concerns involuntary grants of right of way through the exercise of powers of eminent domain, is freely admitted. The issue admitted arises by the nature of the power of eminent domain under attributes of the power as defined by Hugo Grotius, limiting the title of lands acquired from individuals (private property) for the use of all (public purposes) to that use. Subsequent thought, or lack of thought, has measured the quality of the estate in lands taken under the exercise of powers of eminent domain by the statute bestowing the power upon public service corporations and the like. Indubitably, as in Kansas and Oklahoma as reflected by earlier decisions, the character of the title acquired by grant, either voluntary or under compulsion, must be measured not only by the state's grant of the power of eminent domain but as well by the statutes limiting the railroad company's capacity to acquire fee-simple title to lands used as right of way.

By section 1035, Stats. 1890, in force at the time the land involved was acquired for right-of-way and railroad purposes, the railroad corporation had power "to cause . . . survey of its proposed railroad to be made . . . to enter upon lands . . . of any person (and) to take and hold such voluntary grants of real estate . . . as may be made to it . . . but the real estate received by voluntary grant shall be held and used for the purpose of such grant only." Thus, under voluntary grant of real estate "As may be necessary to the selection of the most advantageous route (right of

way) . . . " the statutory limitation upon the voluntary grant of lands acquired for that purpose was for that purpose only. But under the third paragraph of the section, solely relied upon in Marland v. Gillespie, supra, the railway company had power to acquire real estate and other property for general railway purposes as may be necessary, extended to "station, depot grounds, and other accommodation reasonably necessary . . . . (and) to hold and use the same, to lease or otherwise dispose of any part or parcel thereof, or to sell the same when not required for railroad use . . . " In other words, as to such land apart from right of way, the railroad company had capacity to take title, fee simple absolute, and it did so unless by restrictions expressed or implied, as in the case at bar in regard to land taken, it was limited "for railroad purposes" so as to affect the grant.

Thus, according to Elliott on Railroads, sec. 400, where the grant is of "surplus real estate", that is, real estate not forming part of the railroad or its appendages, a deed, unrestricted, vests a fee in the railroad company the same as in a natural person, but neither covenants of warranty nor designation of the grant as a fee controls the deed. The purpose and intent thereof is to be derived primarily from the whole text of the conveying instrument, and the grant contained in that instrument may be measured by the capacity of the corporation to buy or acquire the fee, which it may do as to surplus real estate for grounds and like accommodation but which it may not do as applied to arteries of passage, in which case the grant is limited to an exclusive easement.

Involved in the case at bar is a deed, the construction of which in relation to the quality of the interest in land acquired by the railroad company and the servient tenement, if any, may be measured either by the statute, the power vested in the corporation under its charter, or by the instrument itself. Midstate Oil Co. v. Ocean Shore R.

Co., 93 Cal. A. 704, 270 P. 216. It should not be measured by conditions subsequent, nor of limitation as would ordinarily apply to the individual grant and acquisition of land, for by such refinements of the law justice is ofttimes smothered in her own robes.

This deed plainly shows the grant was for right of way and railroad purposes; the reversionary clause serves to make doubly sure that the land granted was limited to that use. Orth v. Gregory, 98 Okla. 229, 223 P. 385. The character of the grant is sui generis; self-generated, constituting an original of a peculiar species. It was an "easement peculiar to a railroad". In the Orth Case, infra, this question was once and for all times determined and said to be "no longer open for discussion in this jurisdiction". Orth v. Gregory, supra; Northern Pac. Ry. Co. v. Townsend, 190 U. S. 267, 23 S. Ct. 671, 47 L. Ed. 1044; New Mexico v. U. S. Trust Co., supra, 172 U. S. 171, 43 L. Ed. 470 19 S. Ct. 128, cited with approval in Noble v. Oklahoma City, 172 Okla. 182, 44 P. 2d 135, Rio Grande W. R. Co. v. Stringham, 239 U. S. 44, 36 Sup. Ct. 50, 60 L. Ed. 136.

But, like Banquo's ghost, the shades of the departed issue arose again, Marland v. Gillespie, supra, to acquire a faulty construction of both Constitution, not applicable because not existing, and of the statute in force at the time, because selection was made of the nonapplicable provision of it and the the applicable provision was omitted. It was followed by the writer in Cumbey v. Urschel, Magee v. Tom Slick Properties, Inc., 171 Okla. 389, 42 P. 2d 902. Those decisions are not to be justified under the rule stare decisis, et non quieta movere by which courts adhere to precedent and do not unsettle those established. But to which precedent shall we adhere — the former, which had terminal facilities to rightly put the issue at rest? That precedent denoted progress in jurisprudence; it contemplated caution and unwearied exertions on the part of a succession of wise men through a long

course of ages. It limited the domain of justice under the accepted rule of reason. It established an inflexible rule for the future by which it withdrew all future cases to arise, from the dangerous power of discretion. The most enlightened judge or court cannot cast the law loose from its moorings and embark it upon a sea of personal opinion, however desirable that may seem in a given case. Or, shall we adhere to the recent exposition in Marland v. Gillespie, to invoke the Greek system of jurisprudence by which the king sat in judgment to transmit the view of the gods to litigants, permitting the decision in each case to stand alone?

We should guide our course by the ancient landmarks of English and American jurisprudence. We want our laws to be definite and certain. We do not care to submit our affairs to chance or haphazard decisions, to a judge or tribunal bound by no rule or precedent. Equality is a root of our system; equality of treatment and application of the law are conformable to the democratic conception of right and justice. It is a rule of law, not of man. It does not follow that, "to establish justice", "to secure just and rightful government," courts must be bound by either the regimen of our barbarous ancestors or the more recent astigmatic errors evidenced by decisions that abandon precedent. Either course may in some cases invoke upon the public service and private property rights a curse by making the mistakes of yesterday the law of today. Either may fail the state and national purpose, "to establish justice", "to secure just and rightful government".

The recent error is a product of a court of error; an instrument of government, sometimes said to exist for the purpose of correcting errors of others and perpetuating its own. Perpetuation of the error is comparable to the situation when a musician wrecked the harmony of an orchestra by a discordant note. When reproached by the conductor, the musician pointed to his music scale. "Why that's not a note" said the leader, "that's a fly speck". "I know it" replied the musician, "but it was there, so I played it". Oklahoma City v. Dobbins, 172 Okla. 194, 44 P. 2d 148. The penetrating ray of suspicion and re-examination of the profound dissenting opinion of Mr. Justice McNeill reveals the error of our decisions and their bastard birth. We cannot sacrifice life and logic to become the slaves of such abstractions. Where law is judge-made, and bad, as in worn-out decisions rendered by Lord Thurlow or Lord Ellenbarough, why must we wait for another lord to deliver us from it? The late lamented President said: "The law is one of the living forces that guide organized society". We need not then be awed by the legal cenotaph of the historic past. We should not perpetuate errors by the rule stare decisis. Like workmen of the day, we may brush aside legal foliage and trample down the underbrush.

On November 1, 1899, title to the lot in question, without exception or reservation of either the right of way theretofore granted as to the south 40 feet, or the servient tenement impressed with the burden of right of way, by administrator's deed was vested in J. H. Peters. Thereafter, on February 7, 1900, J. H. Peters conveyed by deed to the trustees of the Second Congregational Church all of lot 26 "except that part lying south . . . (the south 40 feet) and heretofore conveyed to the C. O. & G. R. R. Company". We must determine the extent of Peters' conveyance.

In Oklahoma City v. Local Federal Sav. & Loan Ass'n, 192 Okla. 188, 134 P. 2d 565, the rule of law is stated that "The effect of the clear and plain exception in the deed is to exclude the excepted property from the operation of the grant". Therein the language employed to constitute the facts of the deed to which the rule of law was applied was "excepting 40 feet off the north end of said lot, heretofore conveyed to the Choctaw Coal & Railway Company." Thus the phrases used are substantially the same. Therefore, we hold that the

492

exception contained in the deed from Peters to the church provided an exclusion from the grant in clear, unequivocal, and unmistakable language. This language does not relate to a right of way but to the land, and so the exception serves to take something out of the thing granted that would otherwise pass. 18 C. J. 340. The result is that the lot, less that excluded, became vested in the church and that excluded remained in the grantor as of his former right. 16 Amer. Jur. 609; Porter v. Warner-Caldwell Oil Co., 183 Okla. 1, 80 P. 2d 252; Voss v. Thompson, 105 Okla. 238, 232 P. 392. The exception, not by its terms referring to right of way as such, but the part of the lot lying south, reserved it as an estate in land consisting of servient tenement impressed with the burden of the right of way then expected to be used exclusively for that purpose forever. The latter part of the phrase contained in the exception "and heretofore conveyed to the C. O. & G. R. R. Company" was descriptive of the land reserved and not a limitation as to the extent of the reservation.

A reservation will be more strictly construed than a grant. Shell Petroleum Co. v. Hollow, 70 Fed. 2d 811. But there is a limit to strict construction that borders on arbitrariness. It would seem that a balanced mode of construction is that stated and applied in the Building & Loan Case, supra, which is that if the reservation is that of an easement, the servient estate passes with the grant of the whole lot or acreage; otherwise, the grant means what it plainly says. We ought not to require language that *compels* a conclusion; words are mere vehicles to express thoughts and intention. They are mere symbols, seldom exact to the degree of precision. Therefore, the rule in Cuneo v. Champlin, 178 Okla. 198, 62 P. 2d 82, Oklahoma City v. Dobbins, 189 Okla. 381, 117 P. 2d 132, Jennings v. Amerada Petroleum Co., 179 Okla. 561, 66 P. 2d 1069, Kassner v. Alexander Drug Co., 194 Okla. 36, 147 P. 2d 979, does not apply. That rule is:

"A grantor of land abutting on a railway right of way, who owns the fee of the right of way subject to the burden thereof, who, subsequent to the conveyance of the abutting land, owns no part of the land on either side of right of way, is presumed to have conveyed his interest in the right of way, unless a contrary intention clearly appears or is expressed".

The rule is based upon a presumption and one not evidentiary in character. If it were, it might be refuted by evidence dehors the instrument of conveyance as attempted in the Kassner Case. These presumptions are designated as the "bats of the law". They fly in the light of clear expression of intention to the contrary stated in a deed.

The true rule expressed in the Cuneo and subsequent cases may be properly applied only in instances of ambiguity as to the extent of the grant as, for instance, in the Jennings Case, "less the right of way". It was held under the exacting rule of exceptions that the servient tenement passed.

"Recitals 'less right of way or excepting right of way' have a well-defined and accepted meaning and contain no element of uncertainty," says Mr. Justice Hurst in the Jennings Case, followed in Oklahoma City v. Dobbins, 189 Okla. 381, 117 P. 2d 132, and the meaning is one of limitation and not of reservation, so that by the use of such terms in exceptions, the servient tenement passes with the grant, more liberally to be construed. Oklahoma City v. Local Federal Sav. & Loan Ass'n, supra.

In the Cuneo Case the land sold was "south of the right of way". Therein the verge of the law was reached in strict construction by extending the grant horizontally to commence at the first north particle of the right of way and perpendicularly to the depth of hell, where, according to Mr. Blackstone, the servient tenement extends.

It's a far cry from a grant of a whole lot, 140 feet long with an exception as to right of way extending over the south 40 feet, and a grant such as that of the church to the remote grantee,

Marmaduke Corbyn, by which he acquired title to "the north 100 feet" of lot 26. Some things are too plain for construction. They speak for themselves. Where no reason for construction exists, none should be made. There is no ambiguity in the Church-Corbyn deed. Mr. Corbyn acquired exactly what the deed with exactness describes, and no more. To award him more, under the Cuneo rule, is to will him something by the grace of judge-made law, the thought of which is violent to the right of contract and a reproach to the title of judge, an official presumed to will nothing; one whose duty is to declare the will of the law to the end that justice may be attained, not under rule, but by reign of law.

While under this view of the law, the result is the same as in the majority opinion, the result will vary in kindred cases because the possibility of reverter is not an estate in land and it is not subject to sale. Therefore, it is important in this class of cases that courts return to fundamentals of property real.